```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARTHUR E. NOLDER,                     :
               Plaintiff              :
                                      :  Civil Action No. 04-189J
JOANNE B. BARNHART, COMMISSIONER      :
OF SOCIAL SECURITY,                   :
               Defendant              :
```

### Report and Recommendation

Recommendation

Arthur Nolder appeals from the decision of the Commissioner of Social Security denying his application for disability benefits under Title II of the Social Security Act, 42 U.S.C.§§ 401-33, and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C.§§ 1381-83f. Because substantial evidence supports the ALJ's findings that Nolder was not disabled for the period covered by this appeal, I recommend that the defendant's motion for summary judgment, docket no. 9, be granted, the plaintiff's motion for summary judgment, docket no. 8, be denied, and the decision of the Commissioner affirmed.

Report

Nolder applied for benefits in August 2001, Tr. 152-54, alleging disability beginning that month, because he had had a seizure and was under a doctor's orders not to work, and because he was unable to do any lifting. Tr. 163. After the initial levels of review, an ALJ held a hearing on July 8, 2002, Tr. 39-69, and found, on September 20, 2002, that Nolder was not disabled up to and including that date. Tr. 99-113. The Appeals Council, after

receiving a letter brief from plaintiff's counsel advising of new medical developments (a seizure episode after the ALJ hearing), Tr. 139, vacated the ALJ's decision and returned the matter for consideration of new evidence. The same ALJ held a second hearing on August 8, 2003, Tr. 70-96, and on August 26, 2003, again found Nolder not disabled. Tr. 22-29. The Appeals Council, after considering a letter from Robert Usaitis, D.O., dated October 23, 2003, Tr. 370, and a letter brief from Nolder's counsel, Tr. 371-76, denied review of this decision on June 8, 2004, Tr. 7-9, thus making the ALJ's findings the basis for the Commissioner's decision.

The court's duty in reviewing the Commissioner's denial of disability benefits and SSI is to determine whether "substantial evidence," 42 U.S.C.§ 405(g), 1383(c)(3), that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson v. Perales, 402 U.S. 389, 401 (1971), supports the ALJ's finding that Nolder is not disabled. See Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999); Hartranft v. Apfel, 181 F.3d 358, 359 (3d Cir.1999). The definition of disability for purposes of disability benefits and SSI requires an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C.§§ 423(d)(1)(A), 1382c(a)(3)(A).

My responsibility is to examine the whole record, not simply to confirm the existence of those pieces of evidence relied upon by the ALJ, see Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir.1986), and I have therefore read the entire record, whether cited by counsel or not. However, even in cases where my reading of the record would convince to decide issues differently if my review were de novo, the substantial basis level of review does not permit me to substitute my judgment for that of the ALJ. Hartranft v. Apfel, supra, 181 F.3d at 360.

The ALJ used the five-step disability analysis set forth at 20 C.F.R.§§ 404.1520 and 416.920. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The first four steps are not in dispute: (1) Nolder was not working after his alleged onset date; and (2) he has severe impairments, described by the ALJ as including a cerebral aneurysm, a seizure disorder, an adjustment disorder, and polycystic kidney disease, Tr. 28, but (3) Nolder's impairments do not, separately or together, meet the requirements of any per se disability listings. Tr. 95-96. The ALJ found that (4) the evidence established that Nolder was limited to light exertional work, and therefore could not return to his relevant past jobs. See Tr. 92. The ALJ was therefore required to consider whether the evidence showed that Nolder (5) retained the residual functional capacity to do the work necessary in jobs existing in significant numbers in the national economy. See Plummer v. Apfel, supra, 186

F.3d at 428 (at step five, the burden of production shifts to the Commissioner to show existence of work for claimant in the national economy.)

Nolder's medical conditions impose nonexertional limitations which restrict the range of light exertion work he can perform. On August 23, 2001, Nolder went to the emergency room after having a headache which lasted for two days and after experiencing lightheadedness, weakness, passing out, left-sided facial twitching, and drooling. Tr. 226. Nolder's only recent medical complaint had been high blood pressure, but a CT scan of his skull, Tr. 223, as well as an MRI, Tr. 217, showed signs of chronic infarcts in the right cerebral lobes. An EEG showed slowing of background frequencies in the right hemisphere of the brain, which Emilio Gatti, M.D., interpreted as correlated to underlying structural damage. Tr. 216. An echocardiogram also revealed mild-to-moderate aortic root enlargement. Tr. 215.

Because Nolder reported a family history of polycystic kidney disease, he was referred to Sanjeev Anand, M.D., for an examination on August 25, 2001. Tr. 207-08. Anand reported that Nolder had polycystic kidney disease, and that because a renal sonogram showed cortical atrophy of both kidneys, Nolder was at risk for renal failure. Anand recommended that Nolder be evaluated for a cerebral aneurysm because cerebral aneurysms are associated with polycystic kidney disease.

On August 31, 2001, Frank Szumski, D.O., reported Nolder had been discharged from the hospital with prescriptions for Dilantin and Avapro. Tr. 234 Szumski observed that Nolder walked without difficulty. Szumski also referred Nolder to a neurologist for further evaluation.

On September 7, 2001, Mark E. Lipitz, D.O., a neurologist, examined plaintiff. Tr. 272-75. Lipitz diagnosed Nolder as having had right-hemisphere cerebrovascular accidents, and that he presently had a seizure disorder and an aneurysm at the right middle cerebral artery bifurcation. Lipitz recommended that Nolder see a neurosurgeon for treatment of his aneurysm. Accordingly, on October 25, 2001, Howard Yonas, M.D., a neurosurgeon, examined Nolder and recommended surgery to prevent further bleeding or showering of debris from two aneurysms detected in Nolder's cerebral arteries. Tr. 282-83. Yonas performed the surgery to clip Nolder's two aneurysms on November 16, 2001. Tr. 248-50. Yonas reported the surgery went well and that Nolder was discharged a few days later with no neurological deficits. Tr. 281.

On November 25, 2001, Nolder went to the emergency room at the Dubois Regional Medical Center reporting that he had suffered three minute-long seizures with loss of consciousness. Tr. 258-64. Nolder was sent home and advised to follow up the matter with Doctor Yonas. Yonas' report at Tr. 281 is dated November 26, 2001, but appears to have been composed without mention of the ER visit by

Nolder.  In the December 12, 2001 follow up, Lipitz referred to the ER visit in his report that Nolder had "a few seizures approximately one week post-operatively," but Lipitz also observed that Nolder was doing "superbly" following his operation.  Tr. 265-66.  Nolder was now taking Tegretol instead of Dilantin for his seizure disorder, and aside from a six month test of his blood levels and a suggested nerve conduction velocity study for Nolder's complaints of tingling in the fingertips of the fourth and fifth fingers of his left hand, Lipitz made no changes in Nolder's care.

On June 6, 2002, Yonas saw Nolder again, Tr. 315, and reported that since his surgery Nolder "has done well in many regards, other than feeling generally somewhat tired with minor exertion."  Nolder's motor and sensory examinations were normal and he was neurologically intact except for slight numbness in the fifth finger of his left hand.  Nolder's other symptoms were weight gain, which Yonas attributed to the Tegretol, and decreased tolerance to stress, and headaches with exertion.  Yonas reported he planned to taper off the prescription Tegretol in light of Nolder's lack of seizure activity for so long.

On August 26, 2002, Nolder was taken to the ER after two or more seizures of unknown duration.  Tr. 299-313.  This time he was admitted, and the attending physician, Henry Delatorre, M.D., noted that the plan was to return Nolder's Tegretol level to a therapeutic level.  Tr. 305.  Delatorre described Nolder as

conscious, coherent, alert, oriented, not in any postictal state, and feeling fine, and on examination reported that Nolder had good muscle tone and no sensory deficits.  Tr. 304.

On September 10, 2002, Robert J. Usaitis, D.O., Nolder's new primary care physician, saw Nolder after he injured his left knee while doing yard work.  Tr. 355.  Usaitis reported that Nolder had had no seizures since his Tegretol regimen had resumed, and that Nolder's "chronic problems are stable at this point."  On October 9, 2002, Nolder saw Lipitz, and reported no seizures since resuming Tegretol.  On November 7, 2002, Nolder saw Usaitis again, and although he complained of general fatigue, he again denied seizures and headaches.  Tr. 352.  Usaitis again reported Nolder's condition was stable, and prescribed Zocor to treat high cholesterol.

On November 12, 2002, Yonas wrote a letter at Nolder's request, noting that state law prohibited Nolder from driving for six months following his seizure in August, and opining that Nolder could not operate heavy equipment, power tools, or "anything that may prove to be dangerous should he experience another seizure and blackout."  Tr. 314.

On December 2, 2002, Nolder went to the Clearfield Jefferson Community Mental Health Center for counseling.  Tr. 321-24.  Nolder reported being "generally depressed," and Jonathan Heid, M.Ed., diagnosed him as suffering from adjustment disorder with mixed anxiety and depressed mood.  Heid recommended counseling, and

7

Nolder testified that he had gone to counseling (with diminishing frequency as time went on, Tr. 90) but there are no records of counseling sessions.

As mentioned above, Usaitis sent a letter to Nolder's counsel dated October 23, 2003, which was sent to the Appeals Council. Tr. 370. Usaitis stated that Nolder's activities of daily living had greatly declined since Usaitis first met him, and that Nolder suffered from worsening depression. As a result, Usaitis stated, it would be "difficult for Mr. Nolder to engage in substantial employment." Usaitis' opinion obviously was given after the ALJ's decision, and since the Appeals Council denied review it is not evidence which this court can use to find Nolder disabled. Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir.2001). In fact, the court cannot even use Usaitis' report to justify a remand unless the evidence is new, material, and good cause is shown for not producing it before the ALJ. Id. While Usaitis's report is new, it is not material for three reasons: first, Usaitis' opinion does not weaken, much less contradict, the ALJ's findings: Usaitis does not say that Nolder is disabled, only that employment will be "difficult," a proposition used as a starting point by the ALJ; second, Usaitis does not relate his opinion to the time period (pre-August 2003) covered by the ALJ's findings; third, the opinion lacks accompanying objective findings that could have impelled the Appeals Council to grant review. Usaitis relies on Nolder's statements about his

8

activities of daily living, and is in no different position in evaluating Nolder's statements than the ALJ who heard Nolder testify about his activities. While Usaitis also gives an opinion of "worsening depression," it is notably unaccompanied by supporting findings or even by any of the qualifiers present in medical opinions (duration, severity, and amenability to treatment) that physicians would use in communications to one other for the diagnosis and treatment of a patient.

Serious medical events, such as seizures, and serious medical conditions, such as polycystic kidney disease and depressive disorder, are not disabling unless they result in impairment of functional capacity for the duration required by the Social Security Act. See Petition of Sullivan, 904 F.2d 826, 844-45 (3d Cir.1990); see also 20 C.F.R. §404.1530(b). The ALJ had substantial evidence to support his conclusion that Nolder's conditions were limiting but not disabling, namely: 1) Usaitis' opinions (as shown by his office notes for the relevant time period and not his letter to Nolder's counsel) that Nolder was improving or stable; 2) the lack of aggressive treatment for Nolder's depression (for example, counseling, or prescription of increasing or varying antidepressant medications without success); and 3) Nolder's testimony about his activity level, see Tr. 53-57, 80-83, which tended to show that although he fatigued more easily than before his aneurysm surgery, he suffered from no severe physical or psychological deterioration.

9

Nolder himself believed that although he was physically worsening he was "mentally better," Tr. 86-87, and his ability to concentrate on mental tasks such as reading was improving.  Tr. 57.

Nolder was 49 years old when the ALJ issued his decision, a younger individual, and he had a college degree (biological science) as well as supervisory experience in 2000 and 2001, leading a crew in the Pennsylvania Conservation Corps and, from 1986 to 1994, managing a (botanical) nursery.  Since those jobs and Nolder's other previous jobs were at the heavy exertion level, the ALJ obviously found Nolder unable to do them, but the ALJ also took into account the nonexertional limitations imposed by Nolder's concentration difficulties and his fatigue by limiting him to routine, repetitive tasks, not requiring an output quota or exposure to dangerous workplace tasks such as climbing or using automobiles or (even though Nolder testified he used a riding lawnmower at home) dangerous machinery.  Tr. 93.  The ALJ asked a vocational expert whether jobs accommodating these limitations existed in the national economy for a person of Nolder's age and experience.  The vocational expert stated that such a person could do light janitorial work, Tr. 94, as well as many other jobs existing in the local and national economy.

Nolder's inability to perform in supervisory and semiskilled work at the heavy level as he was formerly able to is a severe decline.  The ALJ is required to assess disability not by

10

considering how relatively impaired the claimant is, however, but by considering whether the claimant can still perform jobs that exist in significant numbers in the national economy. The ALJ properly found, on the evidence before him at the time of the hearing, that Nolder could still perform some simple light work. The Commissioner's decision to deny benefits through August 26, 2003, is therefore supported by substantial evidence, and must be affirmed.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: 23/06

Keith A. Pesto,
United States Magistrate Judge

cc:
James R. Schmitt, Esquire
850 Washington Avenue
Carnegie, PA 15106

John J. Valkovci, Jr., Esquire
224 Penn Traffic Building
319 Washington Street
Johnstown, PA 15901